# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5367 | **DATE** | 7/25/2000 |
| **CASE TITLE** | Paul Natkin etal vs. Oprah Winfrey etal | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/2/00 at 10:00.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **The court grants in part and deny in part the plaintiffs' motion for summary judgment (#76-1), the court denies the defendants' summary judgment on count I (#77-1) and the court grant in part and deny in part the defendants' summary judgment mtion on counts II through XI (#78). Additionally, the court denies the defendants' motion to strike (#91-1) as moot. The remaining issues involved in this lawsuit will proceed to trial on 8/14/00 at 10:00 to discuss all issues necessary for a fair and efficient trial.**

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JUL 2 7 2000 | | 107 |
| X | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL NATKIN and STEPHEN GREEN, | ) | No. 99 C 5367 |
| Plaintiffs, | ) | |
| | ) | Judge Ruben Castillo |
| v. | ) | |
| OPRAH WINFREY; HARPO | ) | |
| PRODUCTIONS, INC.; BOB GREENE; | ) | |
| and BUENA VISTA BOOKS, INC., | ) | |
| d/b/a HYPERION, | ) | |
| Defendants. | ) | |

DOCKETED
JUL 27 2000

## MEMORANDUM OPINION AND ORDER

This case is about eleven photographs of Oprah Winfrey taken by Plaintiffs Paul Natkin and Stephen Green on the set of her (rather) well-known television show. The photographs were subsequently published in Winfrey's book *Make the Connection*, co-authored with Bob Greene and published in 1996 by Buena Vista Books under the name Hyperion, without Natkin and Green's permission. That publication resulted in this copyright infringement action and various other causes of action under the Lanham Act and Illinois state law. The defendants counterclaim seeking a declaration of rights.

Currently under consideration by this Court are the plaintiffs' motion for partial summary judgment, (R. 76); the defendants' motion for summary judgment as to Count I, the copyright infringement claim, (R. 77); and the defendants' motion for summary judgment on Counts II through XI, (R. 78). At base, we must decide whether either side has definitively established ownership of the copyrights to the photographs: to succeed on their motion, Natkin and Green must show that they own the copyrights to the exclusion of the defendants and that no valid

license to use the photographs in the book existed, whereas the defendants, to succeed on their first motion, must show that they were at least co-authors of the pictures or had a license that encompassed this use of the photos. For the reasons that follow, we conclude that there is no genuine issue that the defendants authored the photographs, either solely or jointly, but that a triable issue exists as to whether the defendants used the pictures pursuant to a valid license.

As to the defendants' second motion, seeking summary resolution of Counts II through IX, we conclude that the Copyright Act preempts Counts II through V, which include claims under the Lanham Act, the Illinois Consumer Fraud and Deceptive Practices Act, the Illinois Uniform Deceptive Trade Practices Act, and Illinois common law. Counts VI through VIII, which include claims for breach of bailment, conversion, and tortious interference with prospective business advantage, are not preempted and genuine issues exist as to the bailment and conversion claims, but not as to the tort claim. Finally, we dismiss Counts IX and X, which seek declaratory judgment, as duplicative of the plaintiffs' substantive causes of action and deny summary judgment on the plaintiffs' request for attorney fees.

## BACKGROUND[1]

Natkin and Green are both professional "live event" photographers. Natkin owns (and owned during the relevant times) a private photography studio, Photo Reserve, Inc., and throughout the relevant time period he photographed concerts, live television broadcasts, movie sets, rock video productions, and album/CD covers. Green, since 1982, has been employed by

---

[1] We relate the facts according to the well-known and often repeated summary judgment standards articulated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

the Chicago Cubs baseball organization, but also engages in freelance photography for others, such as the organizers of the World Series and NBA playoff games.

Natkin photographed *The Oprah Winfrey Show* between 1986 and 1993; Green worked on the show from 1989 to 1996. The photos at issue here were taken between 1988 and 1995.[2] Natkin and Green primarily shot pictures of the show while it was being taped live in the Chicago studio. On occasion, however, when the show was broadcast from another location, they traveled with the show to take pictures. Additionally, Natkin and Green took posed photographs of Winfrey, usually with her more famous guests, either at the show's studio or their own studios. Both men used their own camera equipment and lenses, brought additional equipment (such as lights and backdrops) when taking posed shots, chose the appropriate film, and usually processed the film themselves. The record contains conflicting evidence about who arranged to process the film when Natkin and Green did not perform that task, which company processed the film, and in all cases who stored the negatives.

When photographing the live show, Natkin and Green had no control over the position or appearance of their subjects (i.e. Winfrey and her guests, the audience, etc.), the layout and design of the sets, or even the lighting of the set – Harpo prohibited Natkin and Green from using flash bulbs or any other light source not provided by the studio. Additionally, during live taping of the show, Natkin and Green were restricted to certain locations – they were allowed to move

---

[2] Natkin and Green complain about the defendants' use of eleven photographs taken by them: the six pictures shot by Natkin appear on pages 12, 20, and 21 of the hardcover version of *Make the Connection*; the five pictures shot by Green appear on pages 20, 45, 53, and 92 (the pictures on pages 45 and 92 are not attributed to Green). Several of the photographs also appear in the paperback version of the book.

freely about the set only during commercial breaks. But, as to creating the photographs, Natkin and Green had complete discretion over the technical aspects of the shoot: they chose which cameras, lenses, and film to use; the appropriate shutter speed, aperture settings, and timing for the shots; and how to frame the images.

During the relevant times, neither Natkin nor Green worked pursuant to a written agreement.[3] Both men billed Harpo Productions a flat fee for each show they photographed and for any related expenses, including such items as parking and film. Harpo never withheld federal income taxes, FICA, or state income taxes from their payments to Natkin and Green and reported those payments to the IRS on 1099 forms (rather than W-2 forms) as "nonemployee compensation." Additionally, Harpo did not provide health or life insurance, pension benefits, or paid vacation to either Natkin or Green, and both men purchased the insurance for their equipment. Neither photographer was ever given a copy of the Harpo employee manual, but both received paid parking, access to the company cafeteria, Harpo security, and invitations to Harpo staff functions. Additionally, both were referred to, and referred to themselves as, staff photographers for the show. When Natkin or Green was unable to photograph a show due to other commitments, they hired the substitute photographer and billed Harpo.

Green's invoices each contained the following provision:

**Terms/Conditions** One time, non exclusive reproduction rights to the photographs listed above, solely for the uses and specifications indicated . . . (unless otherwise indicated in writing). . . . Acceptance of this submission constitutes acceptance of these terms.

---

[3] In September 1995, after the photographs at issue here were taken, Harpo Productions required Green to sign a work-for-hire agreement, which he did.

(*See, e.g.,* R. 85, Pls.' 56.1(a) Statement, Ex. Z, Green Invoice to Harpo of Feb. 25, 1994.) The record contains examples of Green Invoices on which the terms and conditions provision was struck out and "buy out" or "buy out by Harpo" was handwritten and initialed by Green in the margin. (R. 85, Pls.' 56.1(a) Statement, Ex. AA, Green Invoices.) Natkin's invoices explicitly reserved his copyright to the invoiced photos: "All photos remain the property of, and copyrights remain with, Photo Reserve Inc." (R. 85, Pls.' 56.1(a) Statement, Ex. BB, Natkin Invoice, Confirmation of Assignment and Terms of Submission No. 1.)

Natkin and Green contend that they were freelance photographers that were hired by Harpo and Winfrey as independent contractors to take pictures for publicity purposes only. They claim they are the sole authors of the photographs and, having never transferred their copyrights, are the sole owners of the rights to the pictures. Additionally, Natkin and Green maintain that the only possible license Harpo or Winfrey could have obtained was an oral, non-exclusive license to use the photos for publicity purposes. Thus, according to Natkin and Green, publication of the photos in *Make the Connection* infringed their copyrights.

The defendants, on the other hand, contend that Harpo and Winfrey are the authors of the pictures and thus own the copyrights to them. The defendants asserts that Natkin and Green were employees of Harpo and that the pictures were taken within the scope of their employment. Alternatively, they argue that Harpo and Winfrey are joint authors of the photographs because they controlled the vast majority of the picture elements. Finally, as to the infringement claim, the defendants allege that their publication of the pictures in the book was pursuant to a valid license.

In their second motion, the defendants predominantly argue that the plaintiffs' remaining claims are preempted by the Copyright Act, 17 U.S.C. § 301(a). Alternatively and to the extent the claims are not preempted, the defendants argue that the plaintiffs cannot produce evidence in support of their claims.

## LEGAL STANDARDS

We first analyze whether summary judgment on the copyright infringement claims is appropriate. After concluding that a genuine issue exists as to the scope of the defendants' license to use the photographs, we address whether any of the plaintiffs' remaining claims survive summary judgment.

## I. Copyright Infringement Claims

To establish copyright infringement, Natkin and Green must demonstrate that they own the copyrights to the photographs. Under the Copyright Act, ownership of a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Usually, the author of a work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Under normal circumstances, a photographer is the author of his or her photographs. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992); *Lindsay v. R.M.S. Titanic*, 52 U.S.P.Q.2d 1609, 1612 (S.D.N.Y. 1999). But, as with any general rule, exceptions exist. Two specific exceptions are relevant to this case: the "work made for hire" and "joint work" exceptions.

## A. Works Made for Hire

Works made for hire are "authored" by the hiring party, and the "initial owner of the copyright is not the creator of the work but the employer or the party that commissioned the work." *Glovaroma, Inc. v. Maljack Prods., Inc.*, 71 F. Supp.2d 846, 850 (N.D. Ill. 1999); *see also* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title."). A work made for hire is "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire" 17 U.S.C. § 101. The defendants concede that they do not have a written "work made for hire" agreement with either Natkin or Green covering the eleven photographs.[4] Instead, they argue that Natkin and Green were Harpo employees, as opposed to independent contractors, when they took the pictures.

The Supreme Court has set forth a nonexhaustive, thirteen-factor test for determining whether a creator is an employee within the meaning of the Copyright Act's work made for hire provision. *Reid*, 490 U.S. at 751. The *Reid* factors are

> the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payments; the

---

[4] The defendants make a half-hearted (and basically ludicrous) attempt to convince us that Natkin and Green's invoices constitute work made for hire agreements. The invoices, however, are neither signed by both parties nor expressly state that the photographs are works made for hire.

hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* Additionally, *Reid* instructs courts to use general common law agency principles to analyze whether the author of a work for hire is an independent contractor or an employee. *Id.*

Applying the *Reid* factors to our circumstances demonstrates that Natkin and Green were not Harpo employees. Both men were highly skilled professionals specializing in live-action photography; both used (and insured) their own equipment; and both exercised discretion in hiring substitute photographers when they themselves were unavailable and paid those substitutes. Most importantly, neither photographer was ever treated like an employee in terms of compensation, benefits, and taxes: Natkin and Green, via their companies, billed Harpo for their services and expenses, they did not receive regular paychecks or salary; they received none of the employee benefits traditionally associated with employee status, such as health insurance, life insurance, and paid vacation[5]; and Harpo never withheld any payroll taxes on behalf of the photographers.

Further, Harpo's IRS reports describe the payments to Green and Natkin as "nonemployee compensation." We believe this factor alone would outweigh those few factors, discussed below, that favor the defendants' position. Harpo may not obtain the benefits associated with hiring an independent contractor and, at the same time, enjoy the advantages of treating that person as an employee; it must choose. Here, as to Natkin and Green, Harpo chose

---

[5] The defendants' argument that staff parking, security on the set, and invitations to Harpo staff functions are employee benefits provided to Natkin and Green that weigh in favor of their employee status is frivolous, particularly in the face of the utter lack of any employee benefit normally associated with one's status as an employee.

the independent contractor route and cannot now change its position to reap a different benefit it probably had not considered when making its choice (i.e. ownership of the photographs).

The only factors clearly favoring the defendants are that the defendants are engaged in business and the duration of the parties' relationship. That Harpo is a business and that Green and Natkin worked for Harpo over an extended period of time (seven years each) doesn't come close to overriding the impact of the factors favoring the photographers' status as independent contractors. Moreover, that Natkin and Green were referred to as "staff photographers" carries very little weight. *See Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 87 (2d Cir. 1995) ("One of the factors that did not persuade us was the appellants' simplistic contention that usage of the words "employ" or "employment" in the agreements between the artists and [the defendants] establishes that the [artists] were employees.").

The remaining factors are either inconclusive or add insignificant weight in favor of either party's position. For example, all of the parties exercised control over the manner and means of production to some extent: Harpo controlled the appearance of Winfrey and her guests, the sets, and the lighting, while Natkin and Green controlled the technical aspects of taking the photographs (i.e., lenses, film speed, etc.) and, ultimately, the image on the photographs. However, because the task was to create photographs, this factor weighs slightly in favor of independent contractor status. *Compare Marco v. Accent Publ'g Co.*, 969 F.2d 1547, 1551-52 (3d Cir. 1992) ("Accent controlled only the subject matter and composition of the images. Accent did not control most aspects of the work, which include choice of light sources, filters, lenses, camera, film, perspective, aperture setting, shutter speed, and processing techniques."). In any event, Harpo's control of the product here resembles the defendants' control over the

statue at issue in *Reid*, where the Supreme Court concluded the artist was an independent contractor.

That Natkin and Green worked on Harpo's set and were unable to choose when they worked is of negligible importance to our inquiry. Given the nature of the assignment (photographing a live television show), the location and timing of the work was necessarily within Harpo's discretion, and neither factor appears to have much relevance to Natkin and Green's employment status. *Compare Carter*, 71 F.3d at 87 ("Also, that the work was produced on the employer's premises is a necessary incident to all nonremovable art and therefore should not carry great weight.").

Finally, the parties vigorously contest whether "the work is part of [Harpo's] regular business." Natkin and Green contend that the defendants are in the business of producing a television show, not taking pictures of the show, whereas the defendants maintain that they are in the business of promoting Oprah Winfrey, which includes taking photographs of her on the show. Even assuming this factor weighs in favor of the defendants' position, Harpo's treatment of Natkin and Green as independent contractors in terms of pay, taxes, and benefits; the photographers' use of their own equipment, judgment, and expertise; and that the relationship was technically between Harpo and the photographers' companies definitively establishes that Natkin and Green were independent contractors.

On the basis of the record before us, we conclude there is no genuine issue that Natkin and Green were ever Harpo employees. They were not. Harpo hired Natkin and Green as independent contractors, and they continued in that capacity during their tenures with the show. Thus, Harpo must produce a written work made for hire agreement signed by both sides to

successfully claim exclusive ownership of the copyrights to these photographs. *Schiller &*
*Schmidt*, 969 F.3d at 412. Harpo does not have such a document. Consequently, we grant
Natkin and Green's motion for partial summary judgment, while denying the defendants'
summary judgment motion, on the work made for hire issue.

### B. Joint Work

The defendants next claim that they own the copyrights jointly with Natkin and Green
because they are co-authors of the photographs. Co-authors of a joint work "hold undivided
interests in a work, despite any differences in each author's contribution." *Erickson v. Trinity*
*Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994). A joint work is "a work prepared by two or
more authors with the intention that their contributions be merged into inseparable or
interdependent parts of a unitary whole." 17 U.S.C. § 101. But "[a] contributor is not considered
an 'author,' and does not gain a co-owner copyright interest unless her contribution, standing
alone, is copyrightable." *Glovaroma, Inc. v. Maljack Prods., Inc.*, 71 F. Supp.2d 846, 852 (N.D.
Ill. 1999); *see also Erickson*, 13 F.3d at 1070 ("A collaborative contribution will not produce a
joint work, and a contributor will not obtain a co-ownership interest, unless the contribution
represents original expression that could stand on its own as the subject matter of copyright.").
Thus, to establish co-ownership of the photograph copyrights, the defendants must show that
"the parties intended to be joint authors at the time the work was created [and] . . . . that [their]
contributions to the works were independently copyrightable." *Erickson*, 13 F.3d at 1071.
Although the parties have demonstrated a genuine issue as to their intent to create a joint work,
there is no question that the defendants' contributions to the eleven photographs were not
independently copyrightable.

The Copyright Office, whose opinion as to the scope of the Copyright Act is afforded great deference, instructs that "the nature of the thing depicted or the subject of the photograph or hologram . . . is not regarded as a copyrightable element." Copyright Office, *Compendium II of Copyright Office Practices* § 508.01 (1998 Supp.). This is because ideas and facts are not copyrightable; rather copyright law protects only the tangible expression of ideas and facts. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1990). Thus, for example, in *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214-15 (11th Cir. 2000), the Eleventh Circuit rejected a photographer's copyright claim to the subject of his photograph, the combination of items in the photograph, the association of the photograph's subject matter with the best-selling novel on which the picture appeared (an association the defendants copied when advertising their film based on the book), and the "mood" of the photograph. *See also Gentieu v. John Muller & Co.*, 712 F. Supp. 740, 742 (W.D. Mo. 1989) ("[T]he plaintiff cannot claim a copyright on the idea of photographing naked babies. Neither can the poses in which those babies are photographed be the proper material for copyright.").

The defendants' co-authorship claim boils down to the assertion that they contributed non-copyrightable elements to the pictures. Specifically, they claim authorship of Winfrey, her facial expressions, her attire, the "look" and "mood" of the show, the choice of guests, the staging of the show, and so on. In simpler terms, they claim a copyright to the show, which Natkin and Green photographed. But, as just explained, the subject matter of the photographs is not copyrightable. *See Erickson*, 13 F.3d at 1071 ("To qualify as an author, one must supply more than mere direction or ideas. An author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression.") (quotation omitted).

Likewise, a performance itself is not subject to copyright until it is captured in a fixed tangible form. *See id.*; *Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.*, 805 F.2d 663, 674-75 (7th Cir. 1986). No doubt, Harpo has the copyright to the videotape of the show's broadcast; Harpo employees created a fixed, tangible expression of the performances via videotape. But, in terms of the photographs, Natkin and Green translated images of the performance into photographs. As to those photographs, the plaintiffs are the sole authors.

## C. License

Finally, the defendants contend that they published the photographs pursuant to a valid license and, thus, are entitled to summary judgment. First, they contend that the Green invoices with "buy out by Harpo" written in the margin establish their exclusive license as to those photographs. Although that proposition may be accurate, nothing in the record links the photographs in the book to these specific invoices. In other words, there is no evidence that the photographs "bought out" by the invoices in the record are the photographs at issue in this case. Further, the defendants produce no evidence that Harpo always "bought out" Green's photographs or that some other written agreement constituting an exclusive license exists. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996) (Under § 204(a) of the Copyright Act, a transfer of exclusive rights must be in writing.). Thus, we grant summary judgment in favor of the plaintiffs on the issue of whether Harpo had an exclusive license to the photographs published in the book.

Second, the defendants contend that they had an implied nonexclusive license to use the photographs as they did. "A nonexclusive license may be granted orally, or may even be implied from conduct." *Id.* at 775 (quotation omitted). That Harpo had an implied nonexclusive license

to use the photographs taken by Natkin and Green cannot be doubted. The record shows that Harpo regularly used the plaintiffs' photographs in press kits, offered the photographs for publication in magazines and newspapers, and displayed them in Harpo's offices. Natkin and Green never objected to these uses of their photographs and, in fact, maintain that this use constituted the full scope of Harpo's implied license.

The parties agree, however, that a fact issue remains as to the scope of the implied license. (R. 97, Defs.' Resp. Mem. at 32-33; R. 82, Pls.' Mem. at 21 n.8). The plaintiffs claim that the license limited Harpo's use of the photographs to publicizing the show. They submit evidence that it is customary in their field to charge customers a higher day rate and an additional usage fee when the photograph will be used for other than "PR and editorial uses (ie. [sic] magazine/newspaper articles about you)." (R. 82, Pls.' Mem. Ex. 10, Letter from Harrison to Oprah Winfrey of Apr. 23, 1997.) This evidence amply supports their contention that the implied nonexclusive license limited the use of the photographs to publicity for the show.

On the other hand, the defendants submit evidence that the nonexclusive license was not limited to publicity and, even if it were, "publicity" encompasses publication of the photographs in Winfrey's book. For example, although not conclusive, there is some evidence that Natkin and Green gave Harpo their negatives without expecting or requesting their return. Additionally, a Harpo representative claims that she told both Natkin and Green when they were hired that Harpo and Winfrey would use the photographs for whatever purposes they wanted.

Nevertheless, Natkin and Green contend that an implied license of indeterminate duration violates the statute of frauds and that the photographers terminated the implied license. The statute of frauds is simply inapplicable to a copyright license implied by law from the parties'

conduct, "because either party could terminate the relationship in good faith within one year, the statute [of frauds] is not implicated." *Louis Glunz Beer, Inc. v. Martlet Importing Co.*, 864 F. Supp. 810, 818 (N.D. Ill. 1994) (applying statute of frauds defense to a distribution contract of indeterminate duration); *see also Jones v. SABIS Educ. Sys., Inc.*, No. 98 C 4252, 2000 WL 369720, at *3 (N.D. Ill. Apr. 7, 2000) ("Illinois courts have interpreted [the] statute [of frauds] to provide that a contract is unenforceable only if it is impossible of performance in one year.") (quotation omitted) (applying statute of frauds in context of employment contract of indeterminate duration).

On the other hand, the Seventh Circuit recently held that, under Illinois law, a contract of indeterminate duration is terminable at will and that the Copyright Act does not preempt this state law. *Walthal v. Rusk*, 172 F.3d 481, 484-85 (7th Cir. 1999). Thus, in *Walthal*, the plaintiff-musicians' written revocation to the defendant-record producer of its implied license to distribute the musicians' recordings effectively terminated that license, even though the producer manufactured the recording pursuant to the license before the revocation. *Id.* at 485 ("That letter rendered the license kaput."). Here, as in *Walthal*, there is no question that the photographers each sent Harpo a letter containing a blanket revocation of any existing implied licenses to use photographs taken by them. (R. 85, Pls.' Rule 56.1(a) Statement, Ex. H, Natkin letter of Apr. 29, 1997; Ex. N, Green letter of Feb. 26, 1998.)

Unfortunately, whether Harpo's implied license to use the photos was of indeterminate duration is a question of fact, which neither party has definitively answered. Additionally, because we don't know the scope of the implied license, we also don't know if Harpo paid

Page 15

consideration and, if it did, whether that payment precludes at-will termination. Thus, we must deny the plaintiffs' summary judgment motion on this question.

In conclusion, the plaintiffs have demonstrated that they are the sole authors of the photographs and, thus, that they hold the copyrights to the pictures. Furthermore, there is no genuine issue that Natkin and Green granted Harpo an implied license to use the photographs. But a triable issue remains as to (1) the scope of the implied license and whether the defendants' publication of the photographs in *Make the Connection* was permissible under the license, and (2) whether the license was of indeterminate duration such that Natkin and Green's letters effectively revoked Harpo's implied license. A trial will be necessary to answer these questions.

## II. Claims Based on the Lanham Act and Illinois State Law

Natkin and Green allege numerous causes of action in addition to their infringement claim. (R. 17, Am. Compl.) Specifically, they seek relief under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (Count III), and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 (Count IV); and under Illinois common law for unfair competition (Count V), breach of contract for bailment (Count VI), conversion (Count VII), and tortious interference with prospective economic advantage (Count VIII). Additionally, they seek a declaration regarding the right to posses the photographs, ownership of the copyrights in the photographs, and the terms of any license (Count IX (Natkin photographs); Count X (Green photographs)). Finally, in Count XI, the plaintiffs seek attorney fees.

In their second summary judgment motion, the defendants argue that Counts II through X are preempted by the Copyright Act, 17 U.S.C. § 301(a), and alternatively that the plaintiffs

cannot produce evidence supporting every element of each claim. As to Count XI for attorney

fees, the defendants assume success on their first arguments and, from there, argue that the

plaintiffs cannot recover attorney fees for failed Lanham Act and Illinois Consumer Fraud Act

claims.

## A. Preemption under 17 U.S.C. § 301(a)

Section 301 preempts state law based causes of action that are equivalent to copyright

infringement claims:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any state.

17 U.S.C. § 301(a). The Seventh Circuit has set forth a two-part test to determine whether a state

law claim is equivalent to one protected by the Copyright Act: the work at issue must be fixed in

a tangible form and come within the subject matter of copyright as specified in § 102, and the

right asserted must be equivalent to any of the rights specified in § 106. *ProCD, Inc. v.

Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996); *Baltimore Orioles*, 805 F.2d at 674.

Although the Seventh Circuit has not addressed the issue, district courts in this circuit and

other Courts of Appeals have applied these principles to claims brought under § 43(a) of the

Lanham Act. *See, e.g., Montgomery v. Noga*, 168 F.3d 1282, 1298-1300 (11th Cir. 1999); *Lipton

v. Nature Co.*, 71 F.3d 464, 473-74 (2d Cir. 1995); *LaCour v. Time Warner, Inc.*, No. 99 C 7105,

2000 WL 688946, at *3-4 (N.D. Ill. May 24, 2000); *Goes Lithography Co. v. Banta Corp.*, 26 F.

Supp.2d 1042, 1046-47 (N.D. Ill. 1998); *see also Weber v. Geffen Records, Inc.*, 63 F. Supp.2d

458, 464 (S.D.N.Y. 1999) ("[P]laintiff's Lanham Act claim is impermissible because it would

essentially duplicate a Copyright Act claim."). As relevant here *Lipton, LaCour*, and *Goes Lithography* hold that a false designation of origin claim under § 43(a) based exclusively on a copyright notice violation is preempted by the Copyright Act; the *Montgomery* court declined to decide that question, and instead distinguished *Lipton* on the ground that the *Montgomery* defendant was charged with more than a simple copyright notice violation because the defendant claimed actual ownership of the plaintiff's copyrighted material.

Here, Counts II through V of Natkin and Green's complaint are identical to each other:[6] each count complains that the defendants falsely claimed a copyright in the eleven photographs published in *Make the Connection* thereby falsely suggesting that Natkin and Green "endorsed and approved of such use of their [photographs] and their names," (R. 17, Am. Compl. ¶ 39), falsely passing off the photos as belonging to Harpo, (*id.* at ¶ 42), associating Natkin and Green with Harpo and Winfrey without authorization, (*id.* at ¶ 44), and reproducing their copyrighted material without correct attribution of authorship or copyright, (*id.* at ¶ 45). The plaintiffs maintain that these allegations state claims for false designation of origin and false advertising under the Lanham Act; unfair and deceptive business practices under the Illinois Consumer Fraud Act and the Illinois Uniform Deceptive Trade Practices Act; and unfair competition in violation of Illinois' common law.

As a factual matter, Natkin and Green's allegations are not entirely accurate. For example, the photographs in the hardcover version of *Make the Connection* on pages 45, 53, and

---

[6] In fact, Counts III through V (the state law claims) do not allege any new facts, rather they incorporate all prior factual allegations and state only that those facts constitute violations of the respective state laws. (*See* R. 17, Am. Compl. ¶¶ 47-59.)

92 have no copyright notice whatsoever; all of Natkin's photographs used in the book identify him as the photographer; and only two of Green's photographs are not attributed to him.

Be that as it may, Counts II through V are preempted under § 301(a). The works at issue are fixed in a tangible form (photographs), they fall within the subject matter of copyright (§ 102(a)(5) (pictorial, graphic, and sculptural works)), and the rights asserted are equivalent to those specified in § 106, namely the exclusive right to reproduce, distribute, and display the photographs. Although Natkin and Green are creative in arguing all the various harms they suffered as a result of Harpo's alleged misuse of their photographs, they allege only a garden variety copyright violation, and not an especially egregious violation at that. At base, Natkin and Green assert no more than that they own the copyrights to the pictures, the defendants published the pictures without their permission in violation of their copyrights, and the defendants falsely claimed copyrights in some of the pictures. Here, as in *LaCour*, *Goes Lithography*, and *Weber*, the plaintiffs have done nothing more than reallege their copyright claims under the guise of the Lanham Act and identical state law claims. For these reasons, we grant summary judgment in favor of the defendants on Counts II through V of Natkin and Green's amended complaint.

Conversely, Counts VI through VIII are not preempted by the Copyright Act because they allege violations of rights fundamentally different than those protected by copyright. Specifically, Count VI alleges that the defendants, at least Harpo and Winfrey, breached a contract for bailment by taking possession of certain negatives with the understanding that they would return them and then refusing to do so; Count VII states a cause of action for conversion based on the same facts; and Count VIII alleges tortious inference with prospective economic advantage because, without the negatives, the plaintiffs could not follow through on a book deal

they were negotiating. Obviously, these allegations go far beyond those pertaining to copyright law.[7]

## B. The Merits of Counts VI through VIII

Additionally, as to the conversion and bailment claims, the plaintiffs have produced evidence (deposition testimony and affidavits) that the defendants have refused to return their property, namely negatives and hard copies of photographs taken by Natkin and Green, in violation of their contract and the common law. And, again, the record evidence is inconclusive as to which party has a superior right to the negatives and photographs. Therefore, we deny summary judgment as to plaintiffs' bailment and conversion claims.

The result is otherwise with respect to Natkin and Green's tortious interference claim. They have not produced evidence establishing a genuine issue for trial. To demonstrate tortious interference with prospective economic advantage "requires, among other things, a showing that the tortfeasor acted with actual malice." *Capital Options Inv., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992). To show malice, Natkin and Green must produce some evidence that the defendants "acted with a desire to harm which was unrelated to the interest [they were] presumably seeking to protect." *Id.*

---

[7] To the extent the plaintiffs rely on the defendants' use of the eleven photographs in *Make the Connection* to support their bailment and conversion claims, such claims are preempted as argued by the defendants. But the complaint clearly alleges facts beyond the mere use of the eleven pictures.

Although there is some evidence that Green was negotiating a book deal,[8] there is no evidence that any of the defendants did anything to derail those negotiations. Instead, the plaintiffs point to the defendants' response to a supplemental interrogatory listing the prospective publisher as a person with personal knowledge of facts in this lawsuit. First, this interrogatory response does not in any way indicate that the defendants actually communicated with the publisher. More importantly, it doesn't even remotely suggest that, assuming Harpo did communicate with the publisher and gummed up the book deal, Harpo did so out of malice. The plaintiffs do not produce any evidence that Harpo interfered with Green's book deal (or any other unidentified prospective business) or that, if it did, it did so for reasons unrelated to protecting its interests in the photographs. Therefore, we grant summary judgment in favor of defendants on the tortious interference claim.

## C. Counts IX and X

Finally, we dismiss Counts IX and X, seeking declaratory judgment. To the extent Natkin and Green seek a declaration of rights in the eleven photographs, rights in the negatives Harpo possesses, and the terms of Harpo's implied license to use Natkin and Green's pictures, the claims are duplicative of the substantive claims. Once the claims unresolved by this summary judgment proceeding are decided, any declaration would be redundant. To the extent Natkin and Green seek a declaration of anything else,[9] declaratory judgment would be premature.

---

[8] The evidence is far from conclusive though. The letter documenting those negotiations could as easily point to Harpo making a book deal using Green's pictures.

[9] In their reply memorandum Natkin and Green argue only that they are also entitled to a declaration of the right to publish their own book using photos of the show, although this specific claim is not obvious on the face of the complaint. In any event, this question too will be resolved

The plaintiffs have not identified a live controversy that will not be resolved by the close of this lawsuit. Thus, we dismiss Counts IX and X of the amended complaint.

## CONCLUSION

As set forth above, we grant in part and deny in part the plaintiffs' motion for summary judgment, (R. 76-1), we deny the defendants' summary judgment motion on Count I, (R. 77-1), and we grant in part and deny in part the defendants' summary judgment motion on Counts II through XI, (R. 78-1). Additionally, we deny the defendants' motion to strike, (R. 91-1), as moot.

The remaining issues involved in this lawsuit will proceed to trial on August 14, 2000 as previously scheduled. A status hearing will be held on August 2, 2000 at 10:00 a.m. to discuss all issues necessary for a fair amd efficient trial.

Entered:

**Judge Ruben Castillo**
**United States District Court**

Date: July 25, 2000

---

once a decision on the plaintiffs' substantive claims is reached.